UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Action No. 1:05-cr-10124-WGY

UNITED STATES OF AMERICA,

v.

JAMES ARMSTRONG and Virgil Farese,
        Defendant.

DEFENDANT JAMES ARMSTRONG'S MEMORANDUM IN
OPPOSITION TO GOVERNMENT'S MOTION IN LIMINE AND
IN SUPPORT OF DEFENDANT'S CROSS MOTION IN LIMINE

Preliminary

N O W   C O M E S James Armstrong, defendant, by his attorney, and

opposes the government's February 6, 2006 motion in limine and cross moves,

respectfully, for an order pursuant to FRE Rules 403 and 404(b) and the Fifth and

Sixth Amendments to the US Const. excluding the introduction of certain

hearsay evidence of prior bad acts, bad character and prior convictions.  The

government's motion and this opposition and cross motion concern the

government's plan to offer witnesses saying that they had heard Mr. Armstrong

was a "serious kid" or "had done a bid for armed robbery" and had a fight on the

job with his union steward.  Such evidence creates obvious dangers: that prior

bad acts will be used as a necessary inferential ink in proving the government's

case, the adage "once a crook, always a crook"; and confusing the jury that a prior

conviction or being "tough" is synonymous with a reputation for extortionate

collection practices known to and reasonably feared by the debtors.

1

The grand jury record contradicts the government's February 6, 2006 description of its evidence. Counsel recites long passages of his verbatim notes of grand jury testimony to show that the government does not have the proof it claims. At best for the government, the record shows that the witnesses did not fear Mr. Armstrong (some say they considered him a friend, *infra*), but they were aware of his armed robbery conviction (of twenty years ago) and that he had beaten his union steward in a fight over a lay off. Nothing in the record indicates that Mr. Armstrong had a "reputation for the use of extortionate means to collect extensions of credit or to punish the nonrepayment thereof." 18 USC §892(b)(3)(B). Assuming that the government were to establish a competent foundation for reputation evidence (and it probably cannot), the evidence is not relevant to the specific statutory exception to the hearsay rule created by this criminal statute, "a reputation for the use of extortionate means to collect...or to punish...". *Id.*

## FACTS

Most of the people testifying in this case are men who work mining tunnels in deep rock for subways, underground roads, water conduits and undersea sewage disposal. They operate heavy machinery boring hundreds of feet beneath the earth in harsh conditions of dirt and noise from a variety of diesel locomotive engines, facing the constant risk flood, collapse, methane gas, asphyxiation and ordinary on-the-job injury. They are paid relatively well for the risk, sometimes earning more than $70,000.00 or $80,000.00 in a busy year.

2

Many of them are young and, like some in this case, are known to abuse alcohol
and drugs and to gamble compulsively.

Counsel read and took careful notes of the grand jury transcripts of all the
government's trial witnesses and even the transcripts of some witnesses who will
not testify.    The record does not support the government's claim that the
witnesses knew of Mr. Armstrong as a loan shark enforcer.  The government
makes the following statement that reveals the weakness of its position:

> Although none of the victims claimed to have been directly
> threatened by the defendants, each of these individuals all testified
> that the basis of their fear came from their knowledge of defendant
> Armstrong's prior criminal record, specifically that he had been
> convicted of an armored car robbery for which he served a lengthy
> prison sentence.  In addition, two of the three, prior to borrowing
> money from the defendants, had heard about a physical fight that
> defendant Armstrong had with another union member.
> Government's Motion, pp. 1 - 2.

Not a single witness was able to identify a reputation (or specific instance of
conduct) for collecting extortionate extensions of credit.  To the contrary, the
government's only witness who allegedly borrowed from co-defendant Farese
within the statute of limitations period was Scott Campitelli.  Campitelli resisted
being lead by the governmen:

> Q:  Before we came into the grand jury, **did you say
> that you heard he was an enforcer?**
>
> A:  **That's what, that's what, like you guys asked
> me, the question why do you think Jimmy was
> involved with him.  I just said** *maybe*  **-- because
> you said it didn't seem like a good match for an
> older man to be hanging around with this.  I was
> just putting two and two together, I just thought**
> *maybe* **Jimmy, if Duke, being the older man,
> couldn't pay his money, maybe Jimmy would collect**

```
it.  But like I told you with me, I never heard of
it, anything happening to anybody.... [Emphasis
added.]
```

Grand Jury testimony of Scott Campitelli, p. 11.

Like Scott Campitelli, Raymond Moncini was unable to say that he repaid

because he feared someone's "reputation for the use of extortionate means". He

testified he did not remember whom had had borrowed from, but thought

through the "rumor mill" that Armstrong was connected with co-defendant

Farese. The alleged conduct, as with all witnesses other than Campitelli,

occurred beyond the statute of limitations.

```
Q:  You don't remember who you approached to ask
for money?

A:  I don't know.  I just heard it through the
rumor mill out there that they were lending money.
```

Grand Jury testimony Raymond Monsini, p. 25

```
Q:  What was your understanding...if you didn't
pay back?

A:  [asks question]

Q:  Could you have walked away?

A:  I think he ran with Arthur [Burgess] and them
guys.  I think he did some time.  I.. he was on
the swing shift...  Would he just let you walk
away?.. I don't know that.  Was I ever worried?
No, at the time, I wasn't worried.  I was worried
about getting the money and paying my gambling
debt.
```

Grand Jury testimony Raymond Monsini, p. 27.

Witness Scott Colleary also testified to having borrowed money from

defendants.  Unlike any other witness, Scott Colleary testified to James

Armstrong's personal involvement in soliciting Colleary as a borrower, but he

also considered Mr. Armstrong his friend (see, *infra*):

> Q:   What do you think would have happened [if you
> didn't pay it off]?
>
> A:   I can't imagine.  I felt as though Jimmy was
> a friend of mine.   I didn't have any knowledge of
> repercussions if I didn't.  I knew, I think, as
> long as were working together, that I had the
> ability to pay the loan off.  And I knew, if I got
> injured at work and was unable to pay the loan, I
> would probably be able to collect workmen's comp
> and be able to pay the loan back.

Grand Jury testimony Scott Colleary, p. 11..

> Q:   So you never felt any pressure to take the loan?
>
> A:   No.
>
> Q:   And were you ever threatened by anyone to take the
> loan?
>
> A:   No.
>
> Q:   Were you ever threatened to give the money back?
>
> A:   No.

Grand Jury testimony Scott Colleary, p. 18.

The government seeks to miscast a fight that Mr. Armstrong had on the

job with his shop Steward.  Most of the witnesses were aware of a fight between

Armstrong and his shop steward.  The fight can hardly be construed as a

reputation for violence nor did it cast the pall of fear the government claims:

> Q:   Did you ever see Jimmy Armstrong involved in
> any fights?
>
> A:   I heard of a fight with Kevin Callaghan.
>
> Q:   OK...?

```
A:    Kevin was appointed for steward's position
and didn't have any liking for Jimmy Armstrong....
Kevin had called the police....
```

Grand Jury testimony Scott Colleary, pp. 20-21.

Other witnesses confirm that the fight had nothing to do with lending

money:

```
A:    One time Jimmy Armstrong beat up Kevin
Callaghan.

Q:    What's your speculation as to why?

A:    Because Jimmy Armstrong either got fired or
laid off and he was blaming Callaghan who was his
steward.
```

Grand Jury testimony of Mario D'Atillio, p. 36.

The information the government really wants to elicit from these

witnesses is a 1986 conviction; evidence that Mr. Armstrong robbed an armored

car twenty years ago when he was 19. This information has nothing to do with

extortionate credit extensions:

```
Q:    Did you ever hear people describe Jimmy
Armstrong as a pretty serious guy?

A:    No.  But I assume that anybody willing to rob
an armored car is a pretty serious individual.

Q:    So you knew that Jimmy Armstrong was involved
in violence before?

A:    Yeah, I assumed.

Q:    Did you know before you borrowed?

A:    Yeah.  I assumed.
```

Grand Jury testimony Scott Colleary, pp. 20-21. This witness considers himself a friend of Mr. Armstrong, see Grand jury testimony Scott Colleary, p.11, discussed, *supra*. Mr. Colleary has a 1995 conviction for armed robbery.

ARGUMENT
POINT I:
NO SPECIAL RELEVANCE
UNFAIR PREJUDICE

A.    Bad Character Evidence Lacks "Special Relevance".

The bad character and criminal propensity evidence the government wants to use is the link in its inferential chain that Mr. Armstrong was a loan shark enforcer. Character evidence is not proof of extortionate collection practices and it is, therefore, not of special relevance; it is merely prejudicial and not probative of a relevant fact. Even though such evidence could have had (and this does not have) "special relevance" to the debtor's state of mind, if introduced by an adequate foundation, it would still lack sufficient probative value to pass the Rule 403 balancing test.

Rule 404(b) provides that evidence of a defendant's prior bad acts may not be admitted to prove his criminal character or propensity to commit crimes of the sort for which he is on trial. To admit evidence of prior bad acts, a trial court must find that the evidence passes two tests. First, the evidence must have "special relevance" to an issue in the case such as intent or knowledge, and must not include "bad character or propensity as a necessary link in the inferential chain." *United States v. Frankhauser*, 80 F.3d 641, 648 (1st Cir. 1996). Second, under

Rule 403, evidence that is specially relevant may still be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *US v. Varoudakis*, 233 F.3d 113 (1 Cir. 2000).

B.    Statute Does Not Allow "Inferential Link" Based on Bad Acts.

Chapter 42 of Title 18 (the "Statute") does not open the door to the kind of bad man evidence the government wants to use at trial. See, 18 USC §§891 et seq. Under general principles of evidence law, reputation testimony is properly admitted if the witness is shown to live and work in the same community as the subject of the testimony and if the witness is familiar with the subject's reputation for a particular pattern of behavior. *US v. Martorano*, 557 F.2d 1 (1 Cir. 1977) citing *Whiting v. United States*, 296 F.2d 512, 517 (1 Cir. 1961). The government must establish that "victims" within the statute of limitations period (there is only one, Scott Campitelli) knew of and reasonably feared the defendant's extortionate collection practices or his legally-admissible reputation for the same. Unable to meet that legal standard, the government tries here to make its *prima facie* case with testimony about rumors of prior convictions and past associations with known criminals. The government argues that if it cannot prove the defendant had a *reputation for extortionate collection practices* or if the debtors were not fearful of the defendant, then the government can use bad or violent character to let the jury infer that defendant was the type of person who used violence to extort payment of usurious loans - an implication of criminal acts in conformity with bad character.

Likewise, the government's proposed use of a fight between Mr.

Armstrong and his union steward, Kevin Callaghan, is prejudicial without being

probative; there are ample police reports and other evidence (including some of

the witnesses testifying in this case) that the fight had nothing to do with debt

collection. The defense does not contend that the government cannot try to offer

bad act evidence; rather, the defense contends that the government cannot be

allowed to create an element of its case - extortionate lending - with an inference

that the defendant is acting in conformity with his crimes of the past.  The

government has no evidence of a single instance of extortionate practices; no

witness has ever admitted knowing of any instance of violence or other

extortionate conduct or a reputation for using extortion.   Certainly, the

government might use bad act evidence if specially relevant and if its unfair

prejudice is not outweighed by probative value.

> *DeVincent* clearly holds that a prior conviction for a violent crime--
> even one wholly unrelated to the defendant's lending activities--
> may, if known to a debtor, influence the latter's reasonable
> expectations as to how the lender may collect the loan. It is true that
> the Hobbs Act itself permits reputation evidence--usually a
> reputation for violence--in more restricted situations. See 18 U.S.C.
> §§ 892(c), 894(c). But these provisions do not explicitly bar evidence
> of specific prior bad acts, as permitted under Fed. R. Evid. 404(b),
> when offered to show the basis for a victim's fear, and cases besides
> *DeVincent* have followed that course. The weighing of prejudice
> against probative value is otherwise largely for the trial court, see
> Fed. R. Evid. 403, and no abuse of discretion has been shown here.

*US v. Oreto*, 37 F.3d 739 (1 Cir. 1994)(defendants proven to have a gang of

enforcers who beat debotrs).  The statutory element missing from government's

case is proof that debtor believes that the defendant has used *extortionate collection practices* in the past or that the creditor has a reputation for the use of *extortionate collection practices*. The defense agrees that the government could prove a case with direct evidence that a debtor paid back usurious credit under an understanding and threat of violence and believed that he would be harmed if he did not - not the case at bar. 18 USC §894(a), discussed, *infra*. On the other hand, the government is not permitted to make the alternative statutory case simply by proving that its witnesses suspected that Mr. Armstrong was involved in the loan and that he had been convicted of armed robbery. See, 18 USC §894(b), discussed, *infra*.

This Circuit has construed the government's inferential case under §894(b) as follows:

> Recognizing that it might be hard to prove the "understanding of the creditor" directly, Congress declared in 18 U.S.C. § 892(b) that "if it is shown that all the following factors were present in connection with the extension of credit in question, there is prima facie evidence that the extension of credit was extortionate . . . ." Congress then listed four factors: that repayment is unenforceable through civil judicial processes; that the loan requires interest greater than 45 per cent a year; that the loan, added to the borrower's existing debts to the same lender exceeds $100; **and that the debtor reasonably believes either that the lender has used extortion to collect other debts or that the lender has a reputation for doing so.**

*US v. Devincent*, 546 F.2d 452 (1st Cir. 1976)(Coffin, J.).

The government's evidence should be excluded because it fails to pass gate-keeping tests for the statute's special use of hearsay. First, the government

needs to show that there were words or other means of *communication carrying a threat as a means of collection*. See, 18 USC §892, *infra*. If the government has proof of communications carrying no express threat, it can then use reputation evidence to show that the communication is threatening in the community in which it is made.

> § 892. Making extortionate extensions of credit
>
> In any prosecution under this section, if evidence has been introduced tending to show the existence, at the time the extension of credit in question was made, of the circumstances described in section 892 (b)(1) or the circumstances described in section 892 (b)(2), and direct evidence of the actual belief of the debtor as to the creditor's collection practices is not available, then for the **purpose of showing that words or other means of communication, shown to have been employed as a means of collection, in fact carried an express or implicit threat,** the court may in i**ts discretion allow evidence to be introduced tending to show the reputation of the defendant in any community of which the person against whom the alleged threat was made was a member at the time of the collection or attempt at collection.**

The use of indirect proof of the extortionate communications is an element of the alternative method of proving a prima facie case under the statute. The statute itself does not contemplate showing that witnesses had heard of a defendant's bad acts or convictions. Rather, the statute requires the government to prove that its witness knew of an instance extortionate collection 18 USC §894(b)(3)(A) or that the defendant had a reputation for using extortionate collection practices.

> § 894. Collection of extensions of credit by extortionate means

(a) Whoever makes any extortionate extension of credit, or conspires to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

(b) In any prosecution under this section, if it is shown that all of the following factors were present in connection with the extension of credit in question, there is prima facie evidence that the extension of credit was extortionate, but this subsection is nonexclusive and in no way limits the effect or applicability of subsection (a):

(1) The repayment of the extension of credit...would be unenforceable, through civil judicial processes...
....
(2) The extension of credit was made at a rate of interest in excess of an annual rate of 45 per centum calculated according to the actuarial method ...
(3) At the time the extension of credit was made, the debtor reasonably believed that either
(A) **one or more extensions of credit by the creditor had been collected or attempted to be collected by extortionate means**, or the nonrepayment thereof had been punished by extortionate means; or
(B) the **creditor had a reputation for the use of extortionate means to collect extensions of credit** or to punish the nonrepayment thereof.
(4) Upon the making of the extension of credit, the total of the extensions of credit by the creditor to the debtor then outstanding, including any unpaid interest or similar charges, exceeded $100

## C.    No Case in this Circuit Permits Government's Theory

A review of the case law in this Circuit supports Mr. Armstrong's

interpretation of the statute.  In no instance has a court allowed the government

to proceed solely on evidence that a debtor had heard of a defendant's past

conviction for a violent crime.  The facts of the case at bar are easy to distinguish

from all those reported in this Circuit.  In those cases, the government showed

that debtor knew the lender used extortion to collect the debt.  *US v. Devincent*,

546 F.2d 452 (1 Cir. 1976)(defendant having a reputation as a "head-crusher, loan

shark enforcer" and had been convicted of loan-sharking); *US v. Martorano*, 557

12

F.2d 1 (1 Cir. 1977)(enforcer approaching debtor in parking lot outside debtor's night club saying defendant had sent him to collect money, pulling a gun, taking debtor inside to remove $450 from two separate cash boxes); *US v. Devincent*, 632 F.2d 147 (1 Cir. 1980)(appellant in jail for loan sharking, "a pretty bad guy"; debtor knowing of prior instances of appellant's extortionate credit practices; appellant's threats to debtor personally); *US v. Zannino*, 895 F.2d 1 (1st Cir. 1990)(debtor testifying to defendant's boasts about his own reputation as a loan shark, use of violence and threats to collect indebtedness, a *capo regime* in the Patriarca Family); *US v. Oreto*, 37 F.3d 739 (1 Cir. 1994)(debtors testifying defendants employing tall, physically imposing men - e.g., over 250 pounds in weight - to call upon delinquent borrowers and threaten them with physical harm if the loans were not repaid; at least two witnesses testifying they were physically assaulted); *US v. Perrotta*, 289 F.3d 155 (1 Cir. 2002)(extensive evidence that it was defendant's practice to use violence and threats of violence *to collect debts*; surveillance tapes containing several accounts of extortionate techniques; evidence that collectors would "crack" a debtor in order to "scare him enough" to secure payment.)

The government's legal reasoning about the admissibility of a debtor's knowledge or suspicion of prior convictions to show reputation for extortionate collection measures does not withstand scrutiny. Testimony by the debtor about his knowledge of prior convictions and bad acts has been admitted along with other evidence of instances or a reputation for extortionate collections practices.

The Court of Appeals has held that the admission of such testimony together with other evidence *is not reversible error*. However, the government therefore reasons incorrectly that it can cite these authorities as allowing prior convictions and bad acts as evidence of extortionate collection practices. The admission of a twenty year-old conviction for a violent crime (like Mr. Armstrong's robbery conviction) has been *held with reservations not to be reversible erro*r where there was ample evidence the defendant was known to debtors as a "head crusher loan shark enforcer" having a conviction for loan sharking. As the seminal case in this Circuit reasoned:

> .... The judge allowed testimony on appellant DeVincent's twenty-year-old conviction for armed robbery and his ten-year-old murder indictment. Normally, appellant's objections to this testimony would be well taken. Neither of the events could be admitted to show that DeVincent was a bad man. If known to the debtor, however, they can be admitted to show an element of the crime -- the understanding of the debtor that default would be punished with violence. The debtor's awareness of the lender's earlier conviction, or even indictment, for a violent crime surely affects his view of the lender's likely collection practices. F.R.E. 404(b). Both of the revelations came while the debtor was being asked what he knew about the creditors at the time of the loan. Moreover, during this testimony the judge frequently warned the jury that the convictions and indictment were relevant only to the borrower's "frame of mind, in terms of whether or not he had an apprehension he would suffer if he didn't pay this loan. [The past acts are] admitted for no other purpose." *We have qualms still, for this testimony was remote and cumulative; the debtor had already testified that he knew DeVincent as a "head-crusher, loan shark enforcer". He also testified that he knew DeVincent and Visconti had been convicted of loan-sharking. But the court, under these circumstances, may have reasoned that the testimony making these matters remote and cumulative also reduced their prejudicial impact. We cannot say the court committed reversible error in admitting the evidence or in refusing to consider all testimony of*

> *this sort at a preliminary hearing, though the latter course might*
> *have avoided the present problem by revealing that the disputed*
> *evidence was redundant.*

United States v. Devincent, 546 F.2d 452 (1 Cir. 1976).

Review of a subsequent Devincent case reveals the same flaw in the

government's logic. The Court of Appeals has denied objections to the

cumulative nature of testimony about the defendant's violent loan sharking

reputation (something Mr. Armstrong has been shown not to have). But merely

because it is not error to admit such information in the context of other evidence

of violent collection practices does not mean that the government can construct

its case from prior bad acts without evidence of a reputation for extortionate

collection practices.

> Appellant's protestations that this testimony was
> inadmissible under section 892(c) are therefore unavailing. That
> subsection allows evidence of the reputation, in the debtor's
> community, of the creditor's collection practices where direct
> evidence of the debtor's state of mind is unavailable. Where there is
> no such direct evidence the jury is asked to infer that the debtor
> knew of this reputation; this method of proof of the debtor's state of
> mind is clearly more attenuated than direct evidence that the
> debtor was thus informed. However, where the evidence is that
> the creditor's reputation was communicated to the debtor, it is
> admissible under section 892(b)(3)(B) without a showing of
> unavailability. *United States v. Martorano,* 557 F.2d 1, 9-10 & n. 6 (1
> Cir. 1977), cert. denied, 435 U.S. 922, 98 S. Ct. 1484, 55 L. Ed. 2d 515
> (1978); *United States v. Bowdach,* 501 F.2d 220, 225-26 & n. 7 (5 Cir.
> 1974), cert. denied, 420 U.S. 948 (1975).

> Appellant also argues that because there was evidence that
> [debtor] knew of prior instances of appellant's extortionate credit
> practices (i. e., appellant's threats to him in June), there was no need
> to prove that he knew of defendant's reputation in this regard.
> ...[debtor] testified to his fear of bodily harm at appellant's hands....

We cannot say that any one would be sufficient to persuade a jury
or that the others were a "waste of time, or needless presentation of
cumulative evidence." Fed.R.Evid. 403.

United States v. *Devincent*, 632 F.2d 147 (1 Cir. 1980).

POINT II:
REPUTATION EVIDENCE AND
OTHER TESTIMONIAL HEARSAY
VIOLATES CRAWFORD

The use of testimonial hearsay in a criminal prosecution under 18 USC

§§892 & 894 violates the confrontation clause of the Sixth Amendment. See,

*Crawford v. Washington*, 541 U.S. 36 (2004). The hearsay and opinion evidence

(i.e., reputation) of one's co-workers is no less damning than the out-of-court

statements of one's wife (as in *Crawford*). That the reputation evidence concerns

criminal propensity makes should offend the Sixth Amendment all the more.

In *Crawford v. Washington, supra*, the Supreme Court held that the Sixth

Amendment's Confrontation Clause prohibits the admission of out-of-court

statements that are testimonial in nature unless the declarant is unavailable and

the defendant had a prior opportunity to cross-examine the declarant concerning

the statements. *Id*. at 68. *United States v. Hansen*, ___ F.3d ____, No. 03-1331 (1 Cir.

January 13, 2006). As First Circuit noted shortly after *Crawford's* issuance:

> the Supreme Court's decision in *Crawford v. Washington*, 124 S. Ct.
> 1354 (2004), "changed the legal landscape for determining whether
> the admission of certain hearsay statements violates the accused's
> right to confront witnesses." *Horton v. Allen*, 370 F.3d 75, 83 (Cir.
> 2004). Overturning earlier precedent that allowed a court to

16

consider hearsay testimony against a criminal defendant if that
testimony "bore particularized guarantees of trustworthiness," see,
e.g., *Ohio v. Roberts*, 448 U.S. 56, 66 (1980), the *Crawford* Court held
that, absent other grounds for admissibility, the Confrontation
Clause categorically bars the admission of testimonial hearsay
unless the declarant is unavailable and the accused has had a prior
opportunity to cross-examine the declarant. *Crawford*, 124 S. Ct. at
1374 ("Where testimonial evidence is at issue . . . the Sixth
Amendment demands what the common law required:
unavailability and a prior opportunity for cross-examination").
Although the Court left for another day a comprehensive definition
of "testimonial" hearsay, it stated that "[w]hatever else the term
covers, it applies at a minimum to prior testimony at a preliminary
hearing, before a grand jury, or at a former trial; and to police
interrogations," or other "extra-judicial statements . . . contained in
formalized testimonial materials, such as affidavits, depositions,
prior testimony, or confessions." *Id.* (internal quotation marks
omitted). *US v. Rodriguez-Marrero*, No. 01-1647 (1 Cir. 2004).

While this Circuit has previously upheld the use of hearsay against sixth

amendment challenge for violation of the confrontation clause, it did so on the

basis of case law that has been overruled, as the following excerpt demonstrates:

The touchstone is trustworthiness. When a declarant's
unavailability has been shown, the Confrontation Clause may be
satisfied if the declaration bears adequate "indicia of reliability."
*Ohio v. Roberts*, 448 U.S. 56, 66, 65 L. Ed. 2d 597, 100 S. Ct. 2531
(1980). Put in constitutional context, "the mission of the
Confrontation Clause is to advance a practical concern for the
accuracy of the truth determining process in criminal trials by
assuring that 'the trier of fact [has] a satisfactory basis for
evaluating the truth of the prior statement'". *Dutton*, 400 U.S. at 89
(quoting *California v. Green*, 399 U.S. 149, 161, 26 L. Ed. 2d 489, 90 S.
Ct. 1930 (1970)). Thus, the requirements of the Confrontation
Clause regarding the admission of hearsay evidence are met
whenever the evidence falls within a firmly rooted exception to the
hearsay principle. See *Bourjaily*, 483 U.S. at 182-83; *Roberts*, 448 U.S.
at 66.

*United States v. Zannino*, 895 F.2d 1 (1 Cir. 1990). Accordingly, this Circuit's previous rulings concerning the indicia of reliability and *Ohio v. Roberts*, *infra*, are no longer good law.

CONCLUSION

For the reasons set forth above, this motion should be granted.

Dated this 15th day of February, 2006, at Boston, Massachusetts.

/s./ *Kevin L. Barron*

Kevin Lawrence Barron BBO550712
Attorney for James Armstrong
453 Washington Street - 5th Fl.
Boston MA 02111-1325
Tel. No. 617-407-6837
Cellular 617-407-6837
Telecopier 617-517-7711
k@lawyerbarron.com

CERTIFICATE OF SERVICE

Counsel certifies that he has served AUSA Laura Kaplan, Esq., and Co-counsel John LaChance, Esq., electronically with a true copy of this motion by the CM/ECF of this District today on February 15, 2006. No party requires service by mail.

/s./ *Kevin L. Barron*

Kevin Lawrence Barron BBO550712

18